**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| DONALD J. TRICARICO, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:20-CV-92 |
| | ) | |
| MARION GENERAL HOSPITAL, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

This matter is before the Court on the motion for summary judgment filed by Defendant

Marion General Hospital ("MGH") (ECF No. 29). Plaintiff Donald Tricarico filed a response in

opposition (ECF No. 31) and Marion General filed a reply (ECF No. 36). Marion General also

filed a motion for leave to substitute exhibit (ECF No. 35), to which Plaintiff filed a response in

opposition (ECF No. 37) and Marion General filed a reply (ECF No. 38). For the reasons

explained below, the motion to substitute exhibit is GRANTED and the motion for summary

judgment is GRANTED in part and DENIED in part.

**BACKGROUND**

Donald Tricarico was employed by MGH as Chief Administrative Officer beginning on

March 7, 2016. Complaint, p. 1. He was terminated on January 14, 2019, and brought this

lawsuit alleging that his termination violated the Americans with Disabilities Act, 29 U.S.C. §

621 *et seq*., as amended, 42 U.S.C. § 12101 *et seq*., and the Uniformed Services Employment and

Reemployment Rights Act, 38 U.S.C. § 4301 *et seq*. *Id*., p. 2. Tricarico states that he "is a veteran

of the United States armed services, having served as a military officer in Southwest Asia during

the Gulf War[]" and that he "is disabled, suffering from degenerative disc disease in his lower

back, which relates to his military service." *Id.*, pp. 2-3. Tricarico states that he "had a military

disability rating of 40% at the time of his employment at MGH[]" and that "[h]is military

disability rating has since increased to 60%." *Id.*, p. 3. Tricarico states that "[i]n 2017, [he]

informed MGH that he was unable to sit for long periods of time due to injuries [he] sustained

related to his military service, including deployment to Southwest Asia." *Id.* Tricarico explains

that "MGH purchased and installed a Varidesk (an adjustable desk which would allow

Mr. Tricarico to sit or stand) for the purpose of accommodating Mr. Tricarico's health conditions

related to his military service, including left lower radiculopathy of the femoral nerve, lower

extremity radiculopathy of the femoral nerve, and thoracolumbar spine degenerative disc

disease." *Id.* Tricarico contends that MGH violated his rights under the ADA because "MGH

would not have terminated Tricarico's employment, but for his disability." *Id.*, p. 6. Tricarico

also alleges that his termination was in retaliation for having complained about "discriminatory

treatment on the basis of his disability." *Id.*

As to his claims that MGH violated his rights under the USERRA, and retaliated against

him in violation of that Act, Tricarico alleges as follows:

18. Tricarico's supervisor at MGH was Stephanie Hilton-Siebert
("Hilton-Siebert"), who served as Chief Executive Officer.

19. Hilton-Siebert made repeated comments to Tricarico expressing disapproval
of his military background.

20. Hilton-Siebert told Tricarico that she didn't like his "military style."

21. Hilton-Siebert made statements threatening his continued employment such
as, "I brought you here and you're still here because of me and only because of
me" and, "the only thing between you and the door is me."

22. Hilton-Siebert criticized Tricarico for using the gym to stretch and exercise his
back to alleviate physical issues from his military service, about which she was

aware.

Complaint, pp. 3-4 (paragraph numbers in original). Tricarico also alleges that Hilton-Siebert made it difficult for him to perform his duties by "exlud[ing] Tricarico from important meetings at which information was discussed that directly impacted Tricarico's ability to execute some of his job duties[]" (*id.*, p. 4, ¶ 23); that "[d]uring the last seven months of Tricarico's employment, Hilton-Siebert often avoided communicating with Tricarico, and routinely did not respond to his requests to meet with him[]" (*id.*, ¶ 25); that she "rarely responded to Tricarico's updates, and infrequently asked Tricarico any questions regarding the information he provided[]" (*id.*, ¶ 28); and that while "Tricarico requested that Hilton-Siebert convene weekly officer meetings and monthly director meetings as a way to facilitate communication and share information[,] . . . [d]uring the course of Tricarico's three years at MGH, Hilton-Siebert convened six or fewer officer meetings[]" (*id.*, ¶¶ 29 and 30). Tricarico also contends that he "was the only bonus-eligible employee at MGH who did not receive an end-of-year bonus in 2018[,]" (*id.*, p. 5, ¶ 32), that "Hilton-Siebert was the sole decision-maker regarding employee bonuses in 2018[,]" (*id.*, ¶ 34), and that "Hilton-Siebert provided no explanation to Tricarico for denying him a bonus for 2018[]" (*id.*, ¶ 35). Finally, Tricarico states as follows:

> 36. On January 7, 2019, Tricarico's attorney sent Hilton-Siebert a letter raising concerns that the discriminatory treatment and harassment Tricarico had experienced, including the decision to deny Tricarico a bonus in 2018, was motivated by his protected status as a disabled American veteran.

> 37. On January 14, 2019, Hilton-Siebert invited Tricarico to her office and fired him.

*Id.*, pp. 3-5.[1]

MGH argues that it is entitled to summary judgment on Tricarico's claims brought under

the ADA for the following reasons:

> It is undisputed that Tricarico had no work restrictions while employed by Marion
> General, that he never brought the Hospital any medical documentation
> substantiating the existence of any disability, and that he never provided any
> medical documentation to substantiate any form of required disability
> accommodation. (Tricarico 225:13-23; Hilton-Siebert Aff. ¶¶19-25, 28, 29, 45,
> 46; Jones Aff. ¶¶8, 9, 10, 11[2]). Hilton-Siebert testified she was not aware of
> Tricarico having, or claiming to have, any type of disability. (Hilton-Siebert
> 52:5-7). Additionally, Hilton-Siebert never viewed any documentation of any
> alleged disability, nor was she aware that Tricarico suffered from any physical
> limitations. (Hilton-Siebert 52:8-14; Hilton-Siebert Aff. ¶¶21, 23-25, 28-29,
> 45-46). Hilton-Siebert never discussed any accommodations for a disability with
> Tricarico and she was not aware that Tricarico ever claimed to have suffered or
> experienced any injury related to his military service. (Hilton-Siebert 52:24-53:8;
> Hilton-Siebert Aff. ¶¶22-23, 25). Ultimately, no Hospital decision-maker was
> aware of any alleged disability claimed by Tricarico. (Hilton-Siebert Aff. ¶¶19-25,
> 28-29, 45-46; Jones Aff. ¶¶8-11).

Defendant's Statement of Material Facts (ECF No. 30-1), pp. 4-5.

Tricarico bases his USERRA claim on his allegations that Hilton-Siebert expressed

animus about his military background and his "military style" approach to his job. MGH argues

that those claims are unfounded and that Tricarico was fired because he failed to perform his

duties to MGH's reasonable expectations. Specifically, MGH contends that Tricarico was

---

[1]  Attorney David L. Swider, on behalf of Tricarico, sent a letter to Hilton-Siebert dated
January 7, 2019, which indicates that it was sent "VIA UPS Overnight Delivery," and in which
Tricarico complained of discriminatory treatment on the basis of his status as a "disabled
American veteran." Swider Letter to Hilton-Siebert (ECF No. 30-2, pp. 90-91). MGH concedes
that Hilton-Siebert received the letter on January 8 and that it constitutes protected activity for
purposes of Tricarico's retaliation claims.

[2] Karen Jones is Administrative Director of Human Resources for MGH. Jones Affidavit
(ECF No. 30-8), p. 1.

terminated because "Hilton-Siebert identified numerous performance problems with Tricarico during his three years of employment, which ultimately culminated in the termination of his employment with the Hospital. . . . The three overarching reasons that led Hilton-Siebert to fire Tricarico included: 1) his failure to meet the expectations required of the CAO; 2) his inability to work well with others; and 3) an approach to leading and working that were not consistent with Hilton-Siebert's expectation of the culture at Marion General." *Id.*, p. 13 (internal citations to Hilton-Siebert deposition and affidavit omitted).

In sum, MGH argues that it did not violate Tricarico's rights under the ADA because it had no knowledge of his alleged disability, and that his status as a veteran played no role in the decision to fire him–a decision MGH insists was made for the nondiscriminatory reason that MGH was dissatisfied with Tricarico's performance as CAO. Finally, MGH argues that Tricarico's retaliation claims also fail because he cannot establish a causal connection between his alleged protected activity and the adverse employment actions he suffered.

## SUMMARY JUDGMENT STANDARD

Federal Rule 56 states that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The Supreme Court has explained that "the burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "'If the moving party has properly supported his motion, the burden shifts to the non-moving party to come forward with specific facts showing that there is a genuine issue for trial.'" *Simpson v. Gen. Dynamics Ordnance & Tactical Sys.-Simunition Operations, Inc.*,

2019 WL 6912332, at *2 (N.D. Ind. Dec. 19, 2019) (quoting *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015)). Within this context, the Court must construe all facts and reasonable inferences from those facts in the light most favorable to the nonmoving party. *Id*. (citing *Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550 (7th Cir. 2017)). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp*., 24 F.3d 918, 920 (7th Cir. 1994). Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Id*. Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989). If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003).

"Summary judgment is a critical moment for a non-moving party. It must 'respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial.'" *Johnson v. Advocate Health & Hosps. Corp*., 892 F.3d 887, 893-94 (7th Cir. 2018) (quoting *Grant v. Trs. of Ind. Univ*., 870 F.3d 562, 568 (7th Cir. 2017)). "Inferences supported only by speculation or conjecture will not suffice." *Id*. (citing *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721-22 (7th Cir. 2018)). "Neither will the

mere scintilla of evidence." *Id.* (citing *Grant*, 870 F.3d at 571).

The Seventh Circuit in recent years has refined the summary judgment standard of review in employment discrimination cases, explaining as follows:

> On top of the normal lattice of summary judgment demands, we must also apply the constructs of employment discrimination law. For years we have tangled with a "rat's nest of surplus tests" in employment discrimination cases–struggling to pigeon hole evidence into the direct or indirect method with various overlaying requirements of "convincing mosaics" and circumstantial or direct evidence. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764-66 (7th Cir. 2016). Our Circuit has now clarified the singular question that matters in a discrimination case:

> "[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765. "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself. . . . Relevant evidence must be considered and irrelevant evidence disregarded." *Id.*

*Johnson*, 892 F.3d at 893-94.

## DISCUSSION

### I. Motion for Leave to Substitute Exhibit.

Before addressing the motion for summary judgment the Court must address the motion for leave to substitute exhibit filed by MGH (ECF No. 35). By way of this motion, MGH seeks to amend or supplement its summary judgment pleadings–or more precisely, its exhibits in support of its motion for summary judgment–by submitting an exhibit in place of one it says was mistakenly filed. The exhibit at issue is a copy of a Separation Agreement emailed to Hilton-Siebert by MGH's outside counsel on January 5, 2019 (according to her testimony). The Separation Agreement between MGH and Tricarico that summarizes the terms on which Tricarico's separation from the Hospital would be completed (had he accepted it). Tricarico

argues that MGH should not be permitted to submit this new exhibit[3] because Hilton-Siebert's affidavit authenticating it as the version she received on January 5 contradicts her deposition testimony, during which she was shown a later version of the same Agreement and testified that *that* version was the one she received from outside counsel. The difference between the two exhibits is that the one MGH seeks to submit now did *not* include a final termination date *or* the amounts of money MGH was willing to pay Tricarico for wages and severance–those terms were left blank. The version presented during Hilton-Siebert's deposition, and which was filed with MGH's motion for summary judgment (by mistake, says MGH), *included* a termination date of January 14, 2019, and also included the specific amounts MGH would pay pursuant to the Agreement–in other words, there were no blanks. Tricarico argues that this constitutes a conflict or contradiction between Hilton-Siebert's deposition testimony and her affidavit and creates a credibility issue about whether Tricarico's termination date was decided before or after MGH received his attorney's letter.

MGH contends that Tricarico is trying to conjure a credibility issue where one does not exist and that its motion is nothing more than an attempt to correct a simple filing mistake.

According to MGH:

> What is really at issue in this Motion is straightforward. The Hospital's counsel made an unintentional filing mistake. The Motion is nothing more than a request to substitute the proper and intended version of the separation agreement for the incorrect version of the separation agreement that was initially filed. This mistake amounts to nothing more than, effectively, an inadvertent scrivener's error.

---

[3] As MGH points out, and Tricarico does not dispute, the exhibit at issue is not "new" at all since "Plaintiff already received, and had access to, both versions of the separation agreement. The Hospital provided each version to Plaintiff during discovery. Plaintiff is not prejudiced by the substitution of the separation agreement because Plaintiff already had access to both versions of the agreement." Defendant's Reply in Support of Motion for Leave (ECF No. 38), p. 4.

Defendant's Reply in Support of Motion to Substitute (ECF No. 38), p. 3. In the interest of expediency, the Court will dispense with a more detailed discussion of Tricarico's arguments in opposition to the motion except to say that they are flimsy and unpersuasive. The Court also notes that Tricarico does not object to the exhibit on evidentiary grounds; that is, he does not argue that it is inadmissible for some reason under the Federal Rules of Evidence. But most importantly, the admission of the Separation Agreement does nothing to change this Court's analysis or conclusions. MGH submits the exhibit in support of its argument that it made the decision to terminate Tricarico, and prepared a Separation Agreement, before it received his attorney's letter on January 8, thereby foreclosing Tricarico's retaliation claims. Tricarico's opposition to the motion, and his convoluted and unavailing arguments, are a strained attempt to create a credibility issue to save his retaliation claims from summary judgment. However, for the reasons set forth later in this order, the Court concludes that Tricarico's retaliation claims survive summary judgment in any event, and so his objection to the exhibit is essentially moot. There are issues of material fact that must be resolved and credibility determinations that must be made with regard to his retaliation claims, and those issues are not erased by granting MGH's motion. In other words, the Court agrees with Tricarico that fact issues and credibility determinations preclude entry of summary judgment on his retaliation claims, but not for the reason he argues in opposing MGH's motion to substitute its exhibit. Accordingly, the motion is granted and MGH's exhibit, which appears at ECF No. 35-2, is admitted as part of the record on summary judgment.

**II. ADA disparate treatment claim.**

MGH argues in its opening brief that it is entitled to summary judgment on Tricarico's ADA disparate treatment claim because he cannot establish three of the requisite elements of an

9

ADA claim under the familiar *McDonnell-Douglas* burden shifting method of proof. MGH

correctly states that "[f]or an ADA claim to survive summary judgment under the *McDonnell-*

*Douglas* approach, a plaintiff must first establish a prima facie case of discrimination by

showing: (1) he is disabled within the meaning of the ADA; (2) he was meeting his employer's

legitimate employment expectations; (3) he suffered an adverse employment action; and (4)

similarly situated employees received more favorable treatment." Defendant's Brief in Support

(ECF No. 30), p. 5 (citing *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 548 (7th Cir. 2008)). MGH

insists that Tricarico fails to establish the first, second or fourth prong of his prima facie case

(conceding that he suffered an adverse employment action). *Id*. ("Although Tricarico was not

paid a bonus and was discharged from employment, he cannot establish any of the other elements

of the *prima facie* case.").

However, in his response brief in opposition to summary judgment, Tricarico does not

employ the *McDonnell Douglas* burden-shifting method and opts instead to present his claims

and arguments under the alternative method of proof set forth in *Ortiz v. Werner* and its progeny.

Tricarico states that under this method, "[t]o make a *prima facie* case of discrimination under the

ADA, a Plaintiff must prove that '(1) she is disabled within the meaning of the ADA, (2) she is

qualified to perform the essential functions of her job either with or without reasonable

accommodation, and (3) she has suffered from an adverse employment decision because of her

disability.'" Plaintiff's Response (ECF No. 31), p. 15 (quoting *Spurling v. C&M Fine Pack, Inc.*,

739 F.3d 1055, 1060 (7th Cir. 2014)). Tricarico correctly notes that "[t]he Seventh Circuit has

'tried to move away from the many multi-factored tests in employment discrimination cases and

decide, when considering the evidence as a whole, 'whether the evidence would permit a

reasonable factfinder to conclude that the [] proscribed factor caused the discharge.'" *Id.*, pp. 15-16 (quoting *Monroe v. Ind. DOT*, 871 F.3d 495, 503-04 (7th Cir. 2017) (in turn quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). Under either method, though, Tricarico must establish that he was "disabled" within the meaning of the ADA. As MGH argues, he fails to do that and so his ADA claim fails at the outset.[4]

---

[4] While Tricarico can choose to reject the *McDonnell Douglas* burden-shifting method in favor of the more holistic approach of *Ortiz*, he incorrectly asserts in his brief that he can "rely on 'circumstantial evidence that creates "convincing mosaic" from which a reasonable jury could infer discriminatory motive." Plaintiff's Response, p. 20 (quoting *McDaniel v. Loyola Univ. Med. Ctr.*, 2019 WL 1281969, at *13 (N.D. Ill. March 20, 2019) (in turn quoting *Arroyo v. Volvo Group N. Am., LLC*, 805 F. 3d 278, 284 (7th Cir. 2015)). This is incorrect, as MGH points out: "In his response, Tricarico referenced the 'convincing mosaic' standard referenced by some courts prior to *Ortiz*[.] If the 'convincing mosaic' standard was ever appropriate for analyzing discrimination claims, it no longer is. *Ortiz* specifically 'reiterate[d] that 'convincing mosaic' is not a legal test." Defendant's Reply (ECF No. 36), pp. 1-2, n. 1 (citing *Ortiz*, 834 F.3d at 765); *see also, Green v. Wilkie*, No. 18-CV-03488, 2021 WL 2515671, at *4 (N.D. Ill. June 18, 2021) ("Green states that the Court must consider whether his evidence forms a 'convincing mosaic' of discrimination, but the Seventh Circuit has rejected 'convincing mosaic' as a legal test."). This is not to say that Tricarico cannot present circumstantial evidence which, when examined as a whole, gives rise to an inference of discrimination. After all, in most employment discrimination cases circumstantial evidence is the only evidence a plaintiff has. But he cannot argue that his evidence amounts to a "convincing mosaic" and therefore the Court should infer discriminatory intent and deny summary judgment. As the Seventh Circuit explained in *Ortiz*:

> We start with the "convincing mosaic." This phrase originated in *Troupe* [*v. May Department Stores Co.*, 20 F.3d 734 (7th Cir. 1994)] and was designed as a metaphor to illustrate why courts should not try to differentiate between direct and indirect evidence. *Troupe* explained that all evidence is inferential and cannot be sorted into boxes. All evidence should be considered together to understand the pattern it reveals. But instead of persuading district judges and litigants to merge "direct" and "indirect" methods into a unified approach, *Troupe* was understood by many as adding a new "test" that had to be satisfied. How a "mosaic" could be a "test" rather than a mental picture went unaddressed–as did the question how such a legal test could be rooted in the statutes that govern employment-discrimination cases.

> We tried to set things straight in *Sylvester* [*v. SOS Children's Villages Illinois, Inc.*], 453 F.3d [900,] 903-04 [(7th Cir. 2006)] reminding lawyers and judges that

Regardless of the framework in which Tricarico presents his evidence, MGH argues that he fails to meet his initial burden of showing that he was "disabled within the meaning of the ADA." MGH argues that Tricarico was *not* disabled as that term is defined in the ADA, that MGH had no knowledge of any alleged disability, and that Tricarico's claim fails at the outset for those reasons. According to MGH:

> On March 5, 2016, at the onset of his employment with the Hospital, Tricarico completed a Voluntary Self-Identification of Disability form, the contents of which bely any claim that he is disabled within the meaning of the ADA. (Tricarico 150:11-25, Ex. 12). The form requested that Tricarico disclose whether he had a "disability," as defined by the ADA. (Tricarico Ex. 12). Tricarico checked the box on the form which declared, "NO, I DON'T HAVE A DISABILITY."(Tricarico 151:1-6, Ex. 12 (all caps in original)). Tricarico additionally certified "N/A" in the section of the form requesting whether Tricarico required a reasonable accommodation for any disability. (Tricarico 151:7-14, Ex. 12). Tricarico testified in his deposition that he did not mention the need for any type of accommodation because it was "not relevant." (Tricarico 151:15-25). Tricarico also admitted in his deposition that he had no impairments or conditions that met the definition of "disability" under the ADA:
>
> > Q. It says, "You are considered to have a disability if you have a physical or mental impairment or medical condition that substantially limits a major life

---

*Troupe* used "mosaic" as a metaphor that was designed to displace the unhelpful direct and indirect methods rather than add to them. The reminder did not work, as the district court's opinion in this case shows. Despite follow-up reminders that "convincing mosaic" is not a legal test of any kind, *see Muhammad v. Caterpillar, Inc.*, 767 F.3d 694, 699-700 (7th Cir. 2014); *Fleishman v. Continental Casualty Co.*, 698 F.3d 598, 603 (7th Cir. 2012); *Davis v. Time Warner Cable of Southeastern Wisconsin, L.P.*, 651 F.3d 664, 672 (7th Cir. 2011); it has continued to be misused as one.

*Ortiz*, 834 F.3d at 764. *See also*, *Durham v. FreshRealm, LLC*, No. 19-CV-04902, 2021 WL 3089128, at *13 (S.D. Ind. July 22, 2021) (convincing mosaic approach is "defunct."). Accordingly, to the extent Tricarico is inviting the Court to analyze his claims or assess his evidence to determine whether he constructs a "convincing mosaic" that precludes summary judgment, the Court declines and will instead assess Tricarico's evidence with a singular goal: to determine "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [disability] caused [his] discharge."

activity or if you have a history or record of such impairment or medical condition."

Do you believe any of your conditions met that definition?

A. It wasn't a major life -- it didn't limit a major life activity, so no, sir.

Q. None of them did? None of your alleged disabilities?

A. No, sir.

(Tricarico 152:5-16).

Defendant's Brief in Support, pp. 5-6. MGH maintains that based on Tricarico's own testimony, he was not "disabled" within the meaning of the ADA and so his claim fails at the start.

Tricarico concedes that "[w]hen [he] applied for employment at MGH, he did not (yet) need an accommodation[]" and that he "filled out a Voluntary Self-Identification of Disability form, checking a box that said 'No, I don't have a disability.'" Plaintiff's Response in Opposition to Summary Judgment (ECF No. 31), p. 3. However, he insists that during the course of his employment at MGH, his back pain and problems increased and that MGH knew about this problem. Tricarico concludes his argument in support of his contention that he was disabled within the meaning of the ADA with the curious statement that "Tricarico testified unequivocally that he does, *now*, have a disability (under the ADA)." *Id.*, p. 4 (italics in original).

Tricarico also contends that MGH was aware of his disability based on the following:

MGH contends that no Hospital decision-maker was aware of Tricarico's disability. Tricarico disputes this, and presents evidence creating an issue of fact as to whether Hilton-Siebert was aware of Tricarico's disability. Tricarico testified that, in the spring or early summer of 2017, he specifically told Hilton-Siebert that he goes to the gym to strengthen his core and stretch his back because he has issues with his back that stem from his military service. (Ex. 1, Tricarico Dep. 107:4-21). He testified, "It causes me a lot of discomfort when I'm sedentary. And [Hilton-Siebert] told me she understood that because she had lost the use of her legs for a period of time." *Id.* Hilton-Siebert testified that she knew Tricarico

13

would work out on a regular basis, but claims that she did not know this was to alleviate pain related to his disability. (Ex. 2, Hilton-Siebert Dep. 54:13-17; Dkt. 30-5, Hilton-Siebert Aff. ¶¶ 27-28).

MGH does not dispute that Tricarico requested (and received) a VariDesk–an adjustable standing desk. (Ex. 1, Tricarico 108:22-24; Dkt, 30-5, Hilton-Siebert Aff. ¶26; Dkt. 30-8, Jones Aff. ¶12). However, MGH disputes that Hilton-Siebert knew about this accommodation, creating another issue of fact. Tricarico testified that he asked Hilton-Siebert for permission to buy a VariDesk:

Q. So that was the only time you ever had that conversation?

A. The only other time I mentioned my back, sir, was I did ask permission to buy a VariDesk because, again, sitting for long periods of time can cause me a lot of pain. It's related to my military and service-connected disability I had, and she told me she didn't have an issue with me purchasing a VariDesk.

Q. When you say she, you talked to Stephanie about buying this desk?

A. Yes, sir. I talked to Stephanie.

Q. Did Stephanie have to approve you buying a desk?

A. I don't know, sir, but I asked her. I mean, I will ask if I can.

(Ex. 1, Tricarico Dep. 108:5-13). Tricarico believes that Secretary Tina Purvis likely would have been the one to fill out the requisition for the desk purchase. (Ex. 1, Tricarico Dep. 115:11-21).

Hilton-Siebert claims that Tricarico never asked her about buying a standing desk. (Dkt, 30-5, Hilton-Siebert Aff. ¶26).

Plaintiff's Response, pp. 4-5. Tricarico also alleges that "Hilton-Siebert was not just aware of Tricarico's disability, but made derogatory comments about it. At least two days per week (if his schedule permitted), Tricarico would leave around 4:30 p.m., after the conclusion of his work day and outstanding tasks, to go to the gym and alleviate his back pain from sitting all day. (Ex. 1, Tricarico Dep. 106:18-107:3). Hilton-Siebert (and her secretary, Tina Purvis) often made negative comments about Tricarico leaving work for the day to exercise his back–to the point

14

where, in the fall of 2018, Tricarico decreased the amount of time that he was going to the gym

after work." *Id*., p. 6. Tricarico concludes his argument in support of his ADA claim by asserting

as follows:

> One of the reasons communicated to Tricarico for his termination was, "You
> don't work very hard. There is an unwillingness to engage and devote the time
> needed for success of the Hospital, especially when the rest of the team is so
> clearly devoted and working hard. Your work schedule as our Chief
> Administrative Officer regularly begins at 7:30 a.m. and ends at 4:30 p.m."
> (Dep. Ex. 47). The fact that Hilton-Siebert made negative comments about
> Tricarico going to the gym as needed for his disability, and that she specifically
> mentioned this as a reason for his termination, creates an issue of fact as to
> whether Tricarico's disability was a motivating factor in Hilton-Siebert's decision
> to deny him a bonus in 2018, and terminate him in early 2019.

*Id*., p. 7. In sum, Tricarico maintains that while he expressly indicated when he was hired that he

did not have a disability or need any accommodation, his preexisting back problem became more

acute during his employment at MGH and that Hilton-Siebert's "negative comments" about him

leaving work early to go to the gym demonstrate that she was aware of his disability. Based on

that, Tricarico contends that he has established the first element of an ADA claim–that he was a

qualified individual with a disability.

MGH replies by arguing that "[i]t is undisputed that Tricarico was not 'disabled' under

the ADA because he admitted his alleged impairment (degenerative disc disease) did not

substantially limit him in any major life activities." Defendant's Reply (ECF No. 36), p. 6 (citing

Tricarico Depo., ECF No. 30-3, p. 152). MGH also notes that "Tricarico relies on a

determination by the Veterans Administration dated August 1, 2019[,] to substantiate his

assertion that he is '*now*' disabled. . . . The obvious problem for Tricarico is that he was denied a

bonus in December of 2018 and terminated on January 14, 2019. . . . Attempting to substantiate

that he is disabled 'now' as a result of an assessment in August of 2019 is completely immaterial.

15

The timing of determining whether a person is a qualified individual with a disability under the ADA is at the time of the adverse employment action in this case, December of 2018 through January of 2019 . . . There is absolutely no evidence indicating Tricarico's back condition was disabling at the end of 2018 and in early 2019." *Id.*, p. 7 (citing *Hamm v. Exxon Mobil Corp.*, 223 Fed.Appx. 506, 508 (7th Cir. 2007)). MGH insists that "[d]escribing the current symptoms of a condition is not the same as producing actual evidence of a substantial limitation in a major life activity at the time of an adverse employment action." *Id.* (citing *Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 606-07 (7th Cir. 2012) (plaintiff "cannot rely on 'the name or diagnosis of the impairment'; rather, he must show 'the effect of that impairment' on him. Under this standard, [plaintiff's] bare assertion that his aneurism constitutes a disability is insufficient.'")); *see also*, *Burnett v. LFW Inc.*, 472 F.3d 471, 483 (7th Cir. 2006) (citing *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 513 (3d Cir.2001) ("It is well-established that a particular diagnosis, no matter how severe (or severe-sounding to the layperson), standing alone, is not sufficient to establish 'disability.' Rather, the inquiry as to disability is to be made on a case-by-case basis.")). As the Seventh Circuit explained in *Burnett*:

> Burnett would have us find that he was disabled purely because he was suffering from undiagnosed prostate cancer at the time of the adverse employment action. Unfortunately for Burnett, however, typically diagnosis does not prove disability. See 29 C.F.R. pt. 1630, App., § 1630.2(j) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual."); *see also Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566-67, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999) (holding that while some conditions are invariably substantially limiting, to determine whether other conditions are disabling requires an individualized assessment); *Tice v. Ctr. Area Transp. Auth.*, 247 F.3d 506, 513 (3d Cir. 2001) ("[I]t is well-established that a particular diagnosis, no matter how severe (or severe-sounding to the layperson), standing alone, is not sufficient to establish 'disability.' Rather, the inquiry as to disability is to be made on a case-by-case basis."). . . .  Even giving Burnett the benefit of all

16

inferences, we find he has failed to show that he had an impairment that substantially limited a major life activity. Although Burnett fails to expressly identify the affected major life activity, we will presume that he seeks to show that he was substantially limited in the major life activity of working. Under the ADA, "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(i); *see Kupstas v. City of Greenwood*, 398 F.3d 609, 612 (7th Cir. 2005). Rather, "[t]he term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i) (emphases added); *see also Sutton v. United Air Lines*, 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). Because Burnett has failed to show (or to even attempt to show) that his [alleged disability] substantially limited his ability to perform a class or broad range of jobs, he has not established a substantial limitation in the major life activity of working.

Burnett has likewise failed to show that [defendant] regarded him as having a substantially limiting impairment. Nothing in the record suggests that [defendant] considered Burnett to be impaired or substantially limited in his ability to carry out his duties.

*Burnett v. LFW Inc*., 472 F.3d at 483-84. Similarly, in the present case, Tricarico admitted in his deposition that his back condition did not substantially limit a major life activity (in this case, working). He emphasizes repeatedly that he was diagnosed with degenerative disc disease, but as MGH argues, he concedes that his condition did not substantially limit his ability to carry out his duties. And, his diagnosis was contained in a Veteran's Administration determination dated August 1, 2019, nine  months *after* he was denied a bonus and eight months *after* he was terminated. Tricarico presents no evidence that MGH was aware of his alleged disability or considered him disabled when it denied him a bonus or when it terminated him. The only evidence he presents is that MGH provided him with a VariDesk in 2017 and that Hilton-Siebert knew that he went to the gym because he had issues with his back. MGH argues that this evidence is woefully insufficient to establish the first element of an ADA claim:

The undisputed facts establish Tricarico never informed the Hospital he suffered

from a disability; thus, his alleged disability could not be the "but for" cause of any adverse actions. Tricarico contends that in the spring or summer of 2017, he told Hilton-Siebert he goes to the gym to strengthen his core and stretch because he had "issues" with his back. (Response §II(C), pg. 5; Tricarico 107:4-21). This assertion is at least three evidentiary steps away from establishing a genuine issue of fact regarding the existence of a disability. First, even assuming Tricarico said what he contends, a general statement of having "issues" with his back is not even indicative of suffering from an impairment, much less a disability under the ADA. Second, Tricarico presents no evidence that Hilton-Siebert interpreted his vague description of back "issues" as a substantially limiting disability. Third, and perhaps most significantly, Tricarico fails to connect his alleged comment in the spring/summer of 2017 to any adverse action 18 months later.

Tricarico attempts to fill these evidentiary gaps with speculation. He concludes that Hilton-Siebert "knew that he would change into his workout clothes at the end of the day, and that the reason for this was because of his military-related disability." (Response §IV(B), pg. 18). The conclusion does not follow from the premise. It is true Hilton-Siebert knew Tricarico walked around the office in workout clothes and that he often left work early in the afternoon to go the gym, but those facts do not lead to the ultimate conclusion that he suffered from a "military-related disability." Only speculation connects them. *Jones*, 2020 WL 6291462 at *2 ("Inferences supported only by speculation or conjecture will not suffice"). It is undisputed that at no time while employed by the Hospital did Tricarico inform anyone, including Hilton-Siebert, that he was disabled or required an accommodation.

Defendant's Reply, pp. 8-9. MGH concludes its argument on this issue by contending that

"[e]ven if Hilton-Siebert had been aware of Tricarico's alleged disability, there is no evidence

connecting his degenerative disc disease to the denial of a bonus, or his termination." *Id.*, p. 9.

MGH argues that:

Tricarico also invites the Court to consider his "leaving work early" as evidence that Hilton-Siebert interpreted his back "issues" as disabling. While it is true that one of the examples Hilton-Siebert expressed for her assessment that Tricarico was not performing well was that he did not "work very hard." (Response §II(D), pg. 6-7). Tricarico implies that Hilton-Siebert's assessment of his poor work ethic was code for disability discrimination. (*Id.*). As noted above, by his own admission, Tricarico never informed Hilton-Siebert (or anyone else) that he suffered from any disability. (Tricarico 107:13-18). More to the point, there is no evidentiary connection between Tricarico's gym usage at 4:30 p.m. and any adverse employment action. Ultimately, whether he was disabled or not, Tricarico

cannot support a claim of discrimination by claiming his work ethic as the
Hospital's "second in command" is off-limits to scrutiny.

*Id*. Finally, MGH notes that "Tricarico offered additional speculative conclusions that because

the Hospital allowed him to purchase a standing desk, that Hilton-Siebert knew he was disabled.

(Response §§II(C), IV(A), pg. 5, 17). However, it is undisputed that Tricarico never mentioned a

disability accommodation in relation to the desk purchase. (Tricarico 108:5-13)." *Id*. Indeed,

Tricarico testified that he talked to Hilton-Siebert "sometime in 2017" about purchasing a

VariDesk (which he got) but did not recall any other conversation with her and did not know

whether Hilton-Siebert "ha[d] to approve [him] buying a desk." Tricarico Depo., p. 108. He does

not assert that he told Hilton-Siebert (or anyone else) that the VariDesk was necessary because he

had a disability, only that his back would stiffen up if he was sedentary for too long.

At the end of the day, Tricarico's only evidence that he was a qualified individual with a

disability is his own conclusion that he was, coupled with his assertion that since he got a

VariDesk and since Hilton-Siebert knew that he sometimes left work around 4:30 p.m. to go to

the gym to relieve his back pain, he was therefore disabled. In other words, his argument that he

was a qualified individual with a disability is, as MGH contends, based on speculation and legal

conclusions, which are insufficient to survive summary judgment. Tricarico presents no evidence

from which a reasonable jury could conclude that he was discriminated against for having a

disability. For these reasons, MGH's motion for summary judgment is granted as to Tricarico's

ADA claim.

### III. USERRA claim.

Tricarico alleges that MGH's actions violated his rights under the Uniformed Services

Employment and Reemployment Rights Act. USERRA provides that "'[a] person who is a

member of . . . a uniformed service shall not be denied . . . retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership.'" *Smith v. FCA US LLC*., No. 1:17-CV-4262, 2019 WL 2642917, at *5 (S.D. Ind. June 26, 2019) (quoting 38 U.S.C. § 4311(a)). "Such discrimination exists where the employee's service membership was 'a motivating factor' in the employer's adverse action 'unless the employer can prove that the action would have been taken in the absence of such membership.'" *Id*. (quoting 38 U.S.C. § 4311(c)(1)). "'This provision creates a two-step burden-shifting scheme: (1) once a plaintiff makes out a prima facie case by showing that his membership was 'a motivating factor,' (2) the burden shifts to the employer to prove that it would have taken the same action regardless.'" *Id*. (quoting *Arroyo v. Volvo Grp. N. Amer., LLC,* 805 F.3d 278, 284 (7th Cir. 2015)).

Tricarico bases his USERRA claim on statements and comments he alleges Hilton-Siebert made regarding his military service and background. He states in his Complaint that "Hilton-Siebert made repeated comments to Tricarico expressing disapproval of his military background[]" and that she "told Tricarico that she didn't like his 'military style.'" Complaint, p. 3, ¶¶ 19-20. Later in his Complaint, in a section titled "Count III: Violation of the USERRA–Discriminatory Discharge," Tricarico states that the claim is based on the fact that he "is a veteran of the United States armed services[,]" that "MGH treated [him] differently from other employees because of his military veteran status[,]" that "MGH would not have terminated Tricarico's employment, but for his military veteran status[,]" and that he "suffered damages as a result of MGH's termination of his employment[.]" *Id*., pp. 6-7, ¶¶ 51-53, 55. Those conclusory statements are the only allegations in Tricarico's Complaint supporting his USERRA claim.

MGH insists that Tricarico has no evidence to support his USERRA claim. MGH

contends that "Tricarico cannot point to any evidence that his military veteran status was a

motivating factor in the decision to reject him or a bonus and to terminate his employment."

Defendant's Brief in Support (ECF No. 30), p. 13.

> In response, Tricarico alleges as follows:

> [In late 2017] Hilton-Siebert began making negative comments about Tricarico's "military style." . . . HiltonSiebert told Tricarico that she does not like being called "ma'am[.]" . . . She told Tricarico twice he needed to change his military style and his military ways. . . . She threatened that "the only thing standing between you and the door is me." . . . A few months later, she stood in his office doorway and said, "I'm still here, and I'm still evaluating your military ways." . . . Timing is not the only link between the comments, and Tricarico's termination. Hilton-Siebert directly linked Tricarico's veteran status to his termination in the comments themselves–implying that he would be fired if he did not change his military ways.

Plaintiff's Response (ECF No 31), p. 19 (internal citations to Tricarico deposition omitted).

> MGH argues in reply that Hilton-Siebert did not harbor animus about Tricarico's military

background and, in fact, that she respected and appreciated veterans. Hilton-Siebert stated in her

affidavit that:

> 14. I was fully aware of Tricarico's status as a military veteran when he was interviewed and hired.

> 15. I viewed Tricarico's military experience as a positive for Marion General.

> 16. I have several family members who are veterans and I have worked with the American Legion, as well as the VFW . . . for over twenty years.

Affidavit of Hilton-Siebert (ECF No. 30-5) (paragraph numbers in original). Hilton-Siebert also

notes in her affidavit that she hired two other veterans into high-level positions. *Id*., p. 5, ¶¶ 32-

37. MGH and Hilton-Siebert insist it was not Tricarico's military *service* she took issue with, but

rather his "*militaristic style*" to performing his job. She stated in her affidavit that she

"considered Tricarico to have an authoritarian style of work and leadership and I informed him of

my belief that he acted in an authoritarian manner. . . . I observed Tricarico's interactions and also reviewed email communications he had with Hospital staff that led me to conclude Tricarico regularly attempted to assert his authority over people in ways that I did not think was appropriate or productive. . . . I honestly believe that Tricarico's approach was a bad fit for the culture of Marion General." *Id.*, ¶¶ 39-40. MGH adamantly maintains that it had legitimate, nondiscriminatory reasons for denying Tricarico a bonus and for firing him. Hilton-Siebert stated that "[o]ver the course of his employment with the Hospital, I identified many performance deficiencies that warranted Tricarico's termination. The three fundamental reasons that led me to discharge Tricarico included: 1) his failure to meet the expectations required of CAO; 2) his inability or unwillingness to work well with other; and 3) an approach to leading and working that were not consistent with my expectation fo the culture of Marion General." *Id.*, pp. 7-8, ¶ 56. In sum, MGH contends that it was not Tricarico's military veteran *status* that led to his discharge, but rather his militaristic *style* of managing, and that it had legitimate reasons for firing him that had nothing to do with his military background. MGH insists that "[r]ather than address the important difference between Tricarico's alleged 'style' or 'ways' and his actual 'status' as a military veteran, Tricarico again attempts to change the terms of the argument by equating his military 'experience' with his military 'status,' and then equating military 'experience' to his military 'style.' This is a tortured attempt to do not more than conflate the issues in an effort to arrive at the weak conclusion that Tricarico's 'style' should be protected by law. It is not." Defendant's Reply (ECF No. 36), pp. 10-11. Tellingly, MGH contends that "Tricarico's version of these alleged offending statements [by Hilton-Siebert], even if true, cannot *be interpreted* the way Tricarico argues. The key provision of USERRA, for purposes of

22

this case, is to 'prohibit discrimination against persons because of their service in the uniformed services.' 18 U.S.C. § 43019(a)(3). The law protects those who hold the 'status' of a of a former member of the military. . . . Indeed, Tricarico's Complaint asserts that he was discriminated against based on his 'status' as a military veteran. . . . Tricarico implies a connection between these alleged comments concerning his 'ways' and 'style' and his military 'status,' but that is not a *resaonable interpretation* of what USERRA protects." Defendant's Brief in Support (ECF No. 30), p. 18 (italics added). It is precisely because the facts are subject to interpretation that this issue cannot be resolved on summary judgment. Examining the evidence in a light most favorable to Tricarico, and drawing all reasonable inference in his favor, the Court concludes that a jury could "interpret" Hilton-Siebert's alleged comments as relating to Tricarico's military background and service or could "interpret" them to mean what she says they meant–that it was Tricarico's military "style" that she objected to, not his status as a veteran.

MGH is correct that a plaintiff's "military style" approach to performing his or her job is not protected by the USERRA–only a plaintiff's *status* as a military member or veteran is protected by the statute. In the present case, however, after considering the evidence in a light most favorable to Tricarico, and drawing all reasonable inference in his favor, as the Court must do at this stage, the Court concludes that Tricarico's USERRA claim must be presented to a jury. It would be inappropriate at the summary judgment stage for the Court to resolve the dispute over whether it was Tricarico's military status or his military style that led to his discharge. Resolution of this issue requires a weighing of the evidence and credibility determinations.[5]

_____

[5] MGH also asserts that "the Hospital is entitled to rely on the 'same-actor' inference, which is 'the theory that because the same person' is alleged to have initially treated the plaintiff well, but later took an adverse action against him, 'it is unlikely that [decision maker] had a

**IV. Retaliation Claims.**

Tricarico alleges that MGH retaliated against him because he complained about

discrimination on the basis of his disability and his military service. Tricarico asserts that he

engaged in protected activity when his former attorney sent the letter to MGH complaining about

discrimination on January 8, 2019, and that he was fired six days later for having done so. MGH,

of course, argues that the letter had no impact on its decision to terminate Tricarico, which had

already been made before the letter arrived (although MGH concedes that it "delayed

_____

discriminatory motive.'" Defendant's Reply (ECF No. 36), p. 3, n. 2. Just like Tricarico's
statement that he could employ the "convincing mosaic" test to prove his case (he cannot), this
statement by MGH is also wrong. As the Seventh Circuit has explained:

> Our cases . . . have clarified that this inference is not a conclusive presumption
> *and that it should be considered by the ultimate trier of fact rather than on
> summary judgment or the pleadings. See, e.g., Perez [v. Thorntons, Inc.]*, 731
> F.3d [699,] 709 [7th Cir. 2013] ("The 'common actor' or 'same actor' inference is
> a reasonable inference that may be argued to the jury, but it is not a conclusive
> presumption that applies as a matter of law. . . . That inference is 'something for
> the trier of fact to consider.'") (citations and quotations omitted); *Herrnreiter v.
> Chicago Housing Authority*, 315 F.3d 742, 747 (7th Cir. 2002) ("It is misleading
> to suggest (as some cases do) that [the common actor inference] creates a
> 'presumption' of nondiscrimination, as that would imply that the employee must
> meet it or lose his case. It is just something for the trier of fact to consider.")
> (citations omitted); *Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 361 (7th Cir.
> 2001) ("We emphatically rejected the 'same-actor inference' in the
> race-discrimination setting in *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 745
> (7th Cir. 1999). . . .").

> We have tried to impose limits on the common actor inference to ensure it does
> not outgrow its usefulness. The inference may be helpful in some limited
> situations, which is why "we allow the jury to hear such evidence and weigh it for
> what it is worth." *Perez*, 731 F.3d at 710.

*McKinney v. Off. of Sheriff of Whitley Cty.*, 866 F.3d 803, 814-15 (7th Cir. 2017) (italics added).
Accordingly, MGH's argument regarding the common actor inference can be presented to the
jury, but it is not a factor the Court can consider on summary judgment.

implementation" of the termination decision until after it had reviewed and considered the letter).

The ADA prohibits employers from retaliating against employees who assert their rights under the act. 42 U.S.C. § 12203(a). To prevail on his retaliation claim, Tricarico must show that (1) he "engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the two." *Collins v. Am. Fed'n of State, Cty. & Mun. Emps. Council 962*, No. 19-CV-4390, 2021 WL 3140763, at *2 (S.D. Ind. July 26, 2021) (quoting *Guzman v. Brown County*, 884 F.3d 633, 642 (7th Cir. 2018)).

Similarly, "[i]n order to establish a retaliation claim [under USERRA a plaintiff] must demonstrate that (1) []he engaged in activity protected under USERRA and (2) [defendant] took an adverse employment action against h[im]as a result." *Smith v. Vill. of Downers Grove*, No. 18-CV-05649, 2020 WL 1491177, at *13 (N.D. Ill. Mar. 26, 2020), appeal dismissed sub nom. *Smith v. Vill. of Downers Grove, IL*, No. 20-1613, 2020 WL 6039134 (7th Cir. Sept. 3, 2020) (citing *Gross* [*v. PPG Industries, Inc.*], 636 F.3d [884] 892 [7th Cir. 2011])).

In this case, MGH contends that "Tricarico's sole argument is temporal proximity–the short time between the Hospital's receipt of the letter and the termination of his employment a week later. . . . The key problem for Tricarico is that he cannot point to any evidence establishing that Hilton-Siebert was aware of the letter prior to making the decision to terminate him. That problem is insurmountable for Tricarico because the letter had not yet been received when Hilton-Siebert decided to fire him." Defendant's Reply (ECF No. 36), p. 12.

Tricarico's claims of retaliation are based on his attorney's letter sent to MGH on January 8, 2019, in which he complained about discrimination on the basis of his status as a "disabled veteran." MGH does not dispute that Tricarico can establish the first two prongs of a

prima facie case of ADA and USERRA retaliation claims, but argues that he cannot establish a causal connection between that protected activity and his termination–again, because MGH says it made the decision before receiving the letter. In her deposition, Hilton-Siebert testified that the decision to fire Tricarico had already been made before she received Tricarico's attorney's letter (*id*., pp. 44-45: ". . . I had already decided to terminate him as previously stated in early December."). She testified that MGH's decision was not impacted by Tricarico's attorney's letter (*id*., p. 44), but she also testified that MGH "[d]elayed *implementing* the decision long enough to evaluate the letter, but it had nothing to do with the decision[]" (*id*., p. 48 (italics added)).[6] She testified that she met with Tricarico and Karen Jones, director of human resources, on January 14, 2019, to inform him of his termination (*id*., p. 42). Hilton-Siebert Depo., (ECF No. 30-2, pp. 42-43).

There are genuine issues of fact that must be resolved and, more significantly, credibility determinations that must be made regarding the issue of MGH's decision to terminate Tricarico less than a week after receiving his attorney's letter. It is true, as MGH argues, that "in ADA discrimination cases, temporal proximity alone is rarely enough to preclude summary judgment." *Stone v. City of Indianapolis Pub. Utils Div*., 281 F.3d 640, 644 (7th Cir. 2002).[7] It is also true,

---

[6] It was at some point between January 5, the date Hilton-Siebert received a draft of the Separation Agreement, and January 14, the date Tricarico was told he was being terminated, that Hilton-Siebert (with input from Karen Jones) completed the Separation Agreement, inserting a termination date of January 14 and setting forth the amount of money MGH was intending to pay Tricarico upon termination (had he accepted the Agreement).

[7] While "temporal proximity alone is rarely enough" to support a retaliation claim and survive summary judgment, that doesn't mean it is *never* enough: "'[f]or an inference of causation to be drawn solely on the basis of a suspicious-timing argument,' courts 'typically allow no more than a few days to elapse between the protected activity and the adverse action.'" *Nigro v. Indiana Univ. Health Care Assocs., Inc.*, No. 19-CV-03936, 2021 WL 3913484 (S.D.

however, that "[w]hen viewed in light of other evidence, such as evidence of pretext, timing can raise triable issues." *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012). As to MGH's steadfast position that Tricarico was fired because of performance problems, he argues in response that those alleged problems are a smokescreen. He notes that "throughout his entire employment with MGH, Tricarico was *never* counseled, verbally or otherwise, on any performance issues–let alone the specific issues mentioned" by MGH. Plaintiff's Response (ECF No. 31, p. 8). He further notes that "[i]n December of 2017, Tricarico received the second highest performance-based bonus at MGH, apart from Hilton-Siebert herself." *Id.* (citing to Hilton-Siebert Deposition). Tricarico contends that Hilton-Siebert's assertion that he didn't get along with others "is simply not true." *Id.*, p. 9. Tricarico insists that he "was fully devoted to his job[,]" that he would often "work at home and over the weekend, beyond just the hours he was physically located in the office," and that he "was one of the first people to arrive at work every morning[]" even though "Hilton-Siebert was not aware of this fact, because the majority of the time, when she arrived at work, Tricarico was already there." Plaintiff's Response in Opposition (ECF No. 31), p. 6. Tricarico asserts that Hilton-Siebert's statements that Tricarico did not "work very hard," that he had "an unwillingness to engage and devote the time needed for success of the Hospital[,]" and that he routinely ended his work day at 4:30 p.m., are wrong because he was working many more hours than Hilton-Siebert alleged. *Id.*, p. 7. In sum, Tricarico argues that

---

Ind. Sept. 1, 2021) (quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012)). In this case, it is undisputed that Tricarico was fired six days after MGH received his attorney's letter (i.e., six days after he engaged in "protected activity"). A jury must weigh the significance of the timing of the decision in this case, as well as the veracity of MGH's contentions that none of this matters because the termination decision was made before Tricarico's attorney's letter arrived and/or that the letter had no effect on its decision.

MGH's and Hilton-Siebert's allegations regarding his job performance are exaggerated or untrue.

Tricarico contends that "[t]he evidence about timing of the termination decision is contradictory, and the decision could have been made after Tricarico engaged in protected activity by sending a letter alleging discrimination." Plaintiff's Response (ECF no. 31), p. 21. This is a reiteration of Tricarico's argument in opposition to MGH's motion to file a different version of the Separation Agreement. Tricarico contends that Hilton-Siebert's deposition testimony and her affidavit were contradictory. The Court disagrees with that argument but does agree that the veracity of MGH's assertion that it unequivocally made the decision to fire Tricarico before receiving his attorney's letter–and that the letter had no impact on the decision so MGH proceeded to terminate Tricarico even after receiving it–must be determined by a jury. MGH responds by arguing that "Tricarico's conclusion about what 'could have' happened is the very definition of speculation." Defendant's Reply (ECF No. 36), p. 13. That would be true if speculation is all that Tricarico had to support his retaliation claims. But the issue of the timing of Tricarico's termination, coming as it did on the heels of his attorney's letter, coupled with MGH's concession that it delayed implementation of its termination decision long enough to review the letter and then decided to proceed anyway, and the fact that Tricarico was never counseled or reprimanded for any performance problems, gives rise to issues that cannot be resolved on summary judgment–a weighing of the evidence and credibility determinations. As this Court stated recently in another case, whether Plaintiff's evidence and arguments are sufficient to sway a jury remains to be seen, but they sufficient to get to one. For these reasons, MGH's motion for summary judgment on Tricarico's ADA and USERRA retaliation claims must be denied.

**CONCLUSION**

For the reasons set forth above, Defendant MGH's motion for leave to substitute exhibit

(ECF No. 35) is GRANTED and MGH's motion for summary judgment (ECF No. 29) is

GRANTED in part and DENIED in part.


Date: September 8, 2021.

 /s/   William C. Lee
William C. Lee, Judge
U.S. District Court
Northern District of Indiana
